**IN THE COURT OF APPEALS OF IOWA**

No. 25-0369
Filed June 18, 2025

**IN THE INTEREST OF A.M.,**
**Minor Child,**

**N.C., Mother,**
    Appellant,

**B.M., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Benton County, Carrie K. Bryner, Judge.

Parents separately appeal the termination of parental rights. **AFFIRMED ON BOTH APPEALS.**

Allison C. Ackerman of Nidey Erdahl Meier & Araguás, PLC, Cedar Rapids, for appellant mother.

Alexander S. Momany of Howes Law Firm, P.C., Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Annette F. Martin, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered without oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**BULLER, Judge.**

The mother and father separately appeal termination of their parental rights to A.M. (born 2017). After considering the parents' arguments on appeal and the record below, we affirm on both appeals.

The Iowa Department of Health and Human Services (HHS) first became involved with this family in 2023 when deputy sheriffs entered the parents' shared home searching for a suspect on a warrant and observed what the juvenile court described as a "filthy, unsafe home."[1] There were marijuana and methamphetamine pipes easily accessible to the child, as well as pet feces, broken glass, a torch, and knives among the trash and detritus that covered the furniture and floor. At least two of the pipes had drug residue. And an HHS worker who performed a child abuse assessment the following day observed similar conditions in the home. The child was safety-planned to placement with his paternal grandmother and then formally removed from his parents' custody. He was later adjudicated in need of assistance.

The mother tested positive for methamphetamine as part of the assessment and admitted to use. She later denied use when she completed a substance abuse evaluation. Over the life of the case, the mother was offered at least sixty-seven drug-testing opportunities, and she participated in about half. As the juvenile court put it, "She had no periods of sobriety throughout the case with at least twenty-five drug tests positive for methamphetamine. She had a urinalysis test positive for a

---

[1] The body-camera footage was admitted into evidence at the termination trial, and we have reviewed it ourselves. The juvenile court's description is understated. Even grading on the curve of what we see in these cases, the home was hazardous.

very high level of methamphetamine . . . just two weeks before trial." She also had issues completing urine and sweat-patch tests due to tampering or noncompliance on about a dozen occasions. Her criminal history consists of driving violations and a misdemeanor theft.

The father's hair was too short to test at the time of the assessment. He was ordered to test a similar number of times to the mother, and he participated in most—resulting in seventeen test results positive for methamphetamine. His sobriety appeared to improve over the life of the case, with a six-week stretch of negative test results leading up to trial. But he still tested positive for methamphetamine even after completing substance abuse treatment. The father has a more significant criminal history, including domestic abuse assault (against the mother and otherwise), violating a no-contact order, burglary, trespass, public intoxication, numerous thefts, possession of controlled substances and drug paraphernalia, reckless use of fire, and other charges.

The juvenile court credited both parents with consistently attending visits with the child. But, due to the continued substance abuse and other issues, their joint visits remained fully supervised as of trial.

The juvenile court was concerned about the parents' continued relationship given that the father made some progress toward sobriety and the mother "absolutely did not." The court emphasized that it had been clear in its expectations that both parents had to obtain and maintain sobriety in order for them to progress toward reunification because the parents expressed their intention to remain in a relationship and live together. Relatedly, the court was concerned that the parents had been refusing to allow HHS workers and providers to enter the

home, which generated the inference "that the condition of the home had disintegrated and would likely not be safe for the child." And on at least one occasion the mother was dishonest or misled HHS about whether a visit was supervised.

An HHS supervisor testified that he felt as though the parents had been cooperative with him but "just have not produced the results that are reflective of that cooperation and in particular that would be the drug testing results." He opined that the parents were both "dealing with an addiction that is much more significant than what was initially realized." And while he declined to weigh in on "what ifs" about additional time, he expressed skepticism because the mother had not shown any extended period of sobriety and the father had been sober for only about 10% of the life of the case. HHS did not support a guardianship given the child's age— only seven years old as of trial—and the lack of permanency that would entail. The supervisor also stressed that both parents requested the department treat them as a family unit, rather than each parent separately pursuing reunification, and that is how the department treated the case.

The child was doing well in his placement with the grandmother, and they were "close." He had behavioral–emotional struggles and was "hot and cold with school," but he was making progress. He was adoptable and volunteered to the HHS supervisor that he "would like to stay with nana [the grandmother] and see his mom and dad every day."

Neither parent testified at trial. The county attorney, HHS, and the child's guardian ad litem all recommended termination of parental rights. And the juvenile court made an overall finding that the mother had made little to no progress over

the life of the case, while the father made "limited progress" only in the lead-up to trial. The court terminated both parents' rights under Iowa Code sections 232.116(1)(d), (f), (i) and (*l*) (2025). Each parent appeals, and we review de novo. *See In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021).

**Statutory Elements.** The father—but not the mother—challenges sufficiency of the evidence for the statutory elements supporting termination. When a termination ruling rests on multiple grounds, we need find only one supported by the record to affirm. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We choose to focus here on (f), the only element of which the father challenges is whether the child could be safely returned to his custody as of trial. *See* Iowa Code § 232.116(1)(f)(4); *In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018). Although we can recognize the strides the father made in the final weeks leading up to the termination trial, we share the HHS worker's observation that demonstrating sobriety for 10% of the case's duration hardly instills confidence in the father's ability to stay sober and parent safely. In other words, the father's sobriety, while a step in the right direction, has been short-lived at best. And his continued residence with the mother, who has shown no such progress in treating her addiction, is problematic. *Cf. In re G.B.*, No.22-0439, 2022 WL 1657190, at *4 (Iowa Ct. App. May 25, 2022) ("[T]hese parents live together and remain in a relationship. . . . We cannot ignore reality and the extent these parents' lives are intermixed when deciding their respective legal challenges."). And we are concerned by the parents' inability to progress beyond fully-supervised visits. *See In re L.H.*, 13 N.W.3d 627, 629 (Iowa Ct. App. 2024) (holding that unaddressed substance-abuse problems and a failure to progress beyond supervised visits

rendered the parent unable to safely resume custody), *overruled in part on other grounds by In re L.A.*, 20 N.W.3d 529, 534 (Iowa Ct. App. 2025) (en banc). We affirm on the elements.

**Best Interests.** It is not clear to us either parent makes a viable best-interests challenge independent of the issues we address under separate headings in this opinion. To the extent they make such a challenge, we reject it. In reviewing whether termination is in the child's best interests, we give primary weight "to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). We agree with the juvenile court's analysis on this issue and adopt it as our own:

> [The child] is . . . in need of a safe, stable home free from substance abuse issues. He deserves a family to love and care for him each and every day. His parents are not in a position to provide him with that stability and safety at this time. Based on their actions, and lack thereof, during the course of the Child in Need of Assistance proceedings, the Court cannot find that they are likely to be ready to resume care of this child in the reasonably near future. Thus, it is the decision of the Court that the child's need for permanency, security, safety, physical and intellectual health dictate that it is in his best interests to have parental rights terminated.

**Additional Time.** The mother urges the juvenile court should have granted her additional time to work toward reunification. "[T]he juvenile court may deny termination and give the parent an additional six months for reunification only if the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (quoting Iowa Code § 232.104(2)(b)). And the parent bears the burden to make that showing. *Id.* at 322–24. The mother did not carry her burden here. The mother did not make any significant progress

toward treating her substance abuse before trial, and we see no reason to believe that was likely to change in the near future. "The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems." *In re D.A.*, 506 N.W.2d 478, 479 (Iowa Ct. App. 1993) (citation omitted). We affirm the juvenile court's denial of additional time. And to the extent the single fleeting reference to an "additional period of time" in the father's petition on appeal was sufficient to raise this claim we reject it for similar reasons: the 90% of the case the father failed to demonstrate extended periods of sobriety is likely a better indication of the next six months than the 10% of the case he spent sober.

**Guardianship.** The mother suggests the juvenile court should have thwarted termination by ordering a guardianship with the grandmother. But the juvenile court did not rule on this request, so error was not preserved. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."). And we are required to enforce our error-preservation rules even in the absence of the parties pressing this barrier to review on appeal. *See Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000) ("In view of the range of interests protected by our error preservation rules, this court will consider on appeal whether error was preserved despite the opposing party's omission in not raising this issue at trial or on appeal."). But, even if we reached this issue, we would affirm: we share HHS's view expressed below that, given the child's age, a guardianship would not provide permanency. *See A.S.*, 906 N.W.2d at 477–78 (noting that "a guardianship is not a legally preferable alternative to termination" (citation omitted)). And we observe

that termination of parental rights and adoption by the grandmother leaves whether these parents will remain connected to the child going forward in the grandmother's hands: neither our ruling nor that of the juvenile court mandate the grandmother or child cut ties with the mother or father. And the record below gives us confidence the grandmother will decide to involve or not involve the parents as warranted by the child's best interests.

**Permissive Bond Exception.** Last, the parents assert the permissive bond exception codified at section 232.116(3) should have thwarted termination based on their bond with the child. But, as the father admits in his petition on appeal, "the [juvenile c]ourt did not opine or address this aspect" in its ruling. In other words, he concedes there is no ruling on this issue and therefore error is not preserved. With no ruling to review, we cannot reach the merits. *See Meier*, 641 N.W.2d at 537; *Top of Iowa Coop.*, 608 N.W.2d at 470. But we note in the interests of completeness that, even if the issue were preserved, we would not reverse termination of parental rights here: in our de novo review, we don't believe either parent carried their burden to prove by clear and convincing evidence that termination would be detrimental to the child, who needs stability and permanency in a safe and sober home for the reasons we've identified elsewhere in this opinion.

**AFFIRMED ON BOTH APPEALS.**